AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)        ☐ Original   ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT

07/07/2025

CENTRAL DISTRICT OF CALIFORNIA
BY:_____MB_____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

07/07/2025

CENTRAL DISTRICT OF CALIFORNIA
BY:_____KH_____ DEPUTY

United States of America

v.

ARTURO HERMOSILLO and
JULIAN PECORA CARDENAS,

Defendant(s)

Case No.  8:25-mj-00549-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of July 6, 2025 in the county of Orange in the Central District of California, the

defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 372 | Conspiracy to Impede an Officer |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/s/
*Complainant's signature*

Robert Kurtz, Special Agent, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:      July 7, 2025

/s/ Autumn D. Spaeth
*Judge's signature*

City and state:   Santa Ana, California

Hon. Autumn D. Spaeth, U.S. Magistrate Judge
*Printed name and title*

AUSA Danbee Kim x6530

## AFFIDAVIT

I, Robert Kurtz, being duly sworn, declare and state as follows:

### I.    INTRODUCTION

1.    I am a Special Agent with the Department of Homeland Security (DHS) United States Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) assigned to the HSI Los Angeles office, El Camino Real Financial Crimes Task Force (ECR). Since my entry on duty of September 15, 2019, I attended the Federal Law Enforcement Training Center and completed the Criminal Investigator Training Program and Homeland Security Investigations Special Agent Training. In total I have received over 700 hours of training between the two aforementioned trainings on how to conduct investigations into crimes including but not limited to conspiracy, money laundering, cybercrime, and identity theft. I have investigated numerous individuals/entities for a wide range of both federal and state violations of law, during which I have also worked in conjunction with multiple other law enforcement agencies. During this investigation, I used a variety of investigative techniques and resources, interviews, retrieving video surveillance footage, and the review of various databases and records. This affidavit does not include all the investigative information discovered in this case but the information necessary to establish probable cause.

### II. PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of a criminal complaint against Arturo HERMOSILLO ("HERMOSILLO") and Julian

PECORA CARDENAS ("PERCORA CARDENA") for a violation of 18 U.S.C. § 372 (Conspiracy to Impede an Officer).

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaints and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only and all dates and times are on or about those indicated.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

4.    On July 6, 2025, at approximately 07:06 a.m., Border Patrol ("BP") Agents ("BPA") were conducting routine operations in and around the greater Los Angeles and Orange County metropolitan areas. BPAs left U.S. Coast Guard ("USCG") Base Los Angeles / Long Beach located in San Pedro, California.

5.    BPAs were surveilled exiting the USCG base and were followed by HERMOSILLO and PECORA CARDENAS in two vehicles for more than 30 minutes while they traveled to their destination. HERMOSILLO and PECORA CARDENAS, while following the BPAs, were illegally maneuvering their vehicles through traffic, stop lights, and stop signs to stay behind the agent's vehicles. They used their vehicles to impede BPAs from their operations by attempting to block BP vehicles and creating  hazardous

conditions on the road, including outside of the Joint Forces
Training Base Los Alamitos in Los Alamitos, California.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.   HERMOSILLO Background Information

6.   Arturo HERMOSILLO was previously an agitator of an
incident on June 19, 2025.

7.   During an ICE operation, BPAs attempted to render
medical care to an unknown individual that was in or near the
Lowes parking lot at 13500 Paxton Street, Pacoima, California
91331. While attempting to render medical care, a crowd of
approximately 30 individuals formed around the BPAs. Numerous
individuals were approaching and even touching the BPAs.

8.   BPAs further stated subjects in the crowd were making
the following statements, "Fuck ICE, funding nazis", "Kill
yourself you fucking nazi", "I'm gonna kill you and find your
family and kill them".

9.   BPAs alerted the local Fire Department and proceeded
to render care until Fire could arrive. While BPAs were
attempting to leave with detainees in tow, a vehicle operated by
a male individual, later identified as Arturo HERMOSILLO, pulled
in front of the BPA's government issued vehicles and proceeded
to block the BPAs from leaving the area.

10.   BPAs spoke to HERMOSILLO and asked him to let the Fire
department vehicle through.

11.   HERMOSILLO pointed at the fire truck and then at BPAs
and stated, "I'm not blocking them, I'm blocking you!"

(referring to the BPAs). HERMOSILLO was then arrested for impeding federal agents.

12.  Videos and investigative efforts revealed that several vehicles, including HERMOSILLO's vehicle, entered the parking lot at or around the same time, including a silver Toyota that was driven by an individual later identified as R.S. R.S. positioned his vehicle on the opposite side of the fire trucks and BPAs, also opposite from HERMOSILLO's vehicle. R.S. parked his car at the end of the parking aisle in a through-way which consequently was not in a legitimate parking stall. He then approached the BP agents and put his face up to theirs, making hand gestures while yelling at the agents.

13.  On July 5, 2025, R.S. was arrested for assaulting federal agents for punching a BPA in the back multiple times, picking up a baton that was dropped, and assaulting agents with the baton prior to being arrested. Following this arrest, R.S. was interviewed, and he confirmed he was driving the silver Toyota during the June 19, 2025 incident when HERMOSILLO was arrested. In discussing his interest in "un-arresting" people in connection to ICE operations, R.S. admitted to patrolling with other people but refused to provide their names. In reference to the June 19, 2025 incident, R.S. utilized the verbiage "we" indicating that he was not acting nor attending alone when numerous cars arrived at or around the same time as R.S. And HERMOSILLO.

**B.    Following of Border Patrol Agents And Creating A
        Hazardous Condition On The Road**

14.    On July 6, 2025, at approximately 07:06 a.m., BPAs
left the USCG base in San Pedro, CA. While exiting in an
unmarked white sprinter van in a convoy of approximately 4-5
vehicles, the BPAs stated there were numerous protesters taking
pictures and holding signs.

15.    Behind the protesters' crowd were two individuals,
later identified as Arturo HERMOSILLO and Julian PECORA
CARDENAS, in or around their vehicles. As the sprinter van and
other BPAs drove by, HERMOSILLO was seen with his window down,
in a Chevrolet Camino, waving to an individual in a blue Hyundai
Elantra later identified as PECORA CARDENAS and pointing at the
sprinter van.

16.    At that time, the blue Hyundai Elantra ("VH1") bearing
plate # 9RWV967 was seen pulling out of its parked location and
traveling at a high rate of speed towards the sprinter van. VH1
caught up to the sprinter van and proceeded to follow it away
from the USCG base.

17.    I know from past experience that individuals will take
videos and photographs of law enforcement to identify law
enforcement personnel and their corresponding vehicles. I also
know that the aforementioned white sprinter van has been
photographed at various locations around the greater Los Angeles
metropolitan area.

18.    BPAs reported that they were being followed to a BPA
supervisor. BPAs attempted to maintain proper driving distance

from each other while VH1 would drive to the front of the
sprinter van, brake in front of the sprinter van, and
erratically change lanes around the sprinter van. VH1 did not
maintain the lane and would operate the vehicle often within
inches of the sprinter van while subsequently recording the
BPAs.

19.  During this time, HERMOSILLO was operating a Chevrolet
Camino ("VH2") bearing plate # 8U61365 and maintained distance
to the rear of the BPAs.

20.  I know based on training and experience that it is
common for individuals conducting surveillance to maintain
distance in the event the subject of surveillance makes abrupt
direction changes. I also know it is a way of remaining
undetected to stay anonymous from law enforcement personnel.

21.  BPAs were instructed to meet at an alternate location
(12752 Valley View St. Garden Grove, CA 92845) as to not lead
the VH1 and VH2 to the BPA's true destination. In the
approximate 15-20 minutes while driving to the alternate
location, BPAs observed VH1 swerve towards the sprinter van,
drive in front and brake excessively, drive erratically not
maintaining lanes, drive through red lights, drive through stop
signs, and operating the vehicle at high rates of speed.
Additionally, during this time VH2 was increasingly encroaching
on the white sprinter van.

22.  Based on training and experience I know that it is
common for individuals to escalate actions as they are
increasingly allowed to go unchecked.

23.  BPAs arrived at the alternate location and upon attempting to park the sprinter van, PECORA CARDENAS almost collided with the sprinter van and maneuvered the front of VH1 to block the sprinter van from making progress into the parking spot.

24.  VH1 was approached by a BPA wearing an official Border Patrol Uniform, Border Patrol Agent identifiers and body armor displaying a visible badge clearly stating the BPA's status as a Border Patrol Agent. The body armor also had clear wording on both front and back stating the BPA is a federal agent with the Border Patrol.

25.  The BPA identified himself as U.S. Border Patrol and instructed PECORA CARDENAS to roll down the window of VH1. PECORA CARDENAS was non-compliant and BPAs further instructed PECORA CARDENAS to allow agents to park. To deescalate the situation, BPAs attempted to relocate to Joint Forces Training Base Los Alamitos, located at 11206 Lexington Ave, Los Alamitos, California.

26.  After BPAs pulled out of the parking lot, VH1 and VH2 immediately started following the sprinter van again. Similarly to before, vehicles VH1 and VH2 were driving erratic and dangerously close to the agents while illegally driving through red lights to keep up with the sprinter van and swerving in and out of clearly marked lanes. For example, at certain points, VH1 suddenly swerved into the sprinter van's lane in an apparent attempt to wedge itself between the sprinter van and another BP

vehicle and swerved back into its proper lane because there was not enough space and did this several times.

27.  At approximately 7:46, more than 30 minutes after the BPAs left the USCG base, as BPAs and the sprinter van approached the Joint Forced Training Base Los Alamitos, BPAs witnessed VH2 swerve into the on-coming traffic lane and accelerate to a high rate of speed in the wrong direction down the road towards the sprinter van and base. It appeared VH2 was trying to cut off the sprinter van that was about to pull into Joint Forces Training Base Los Alamitos. At this time, the BPA that previously made contact with PECORA CARDENAS activated his vehicle's emergency lights and sirens. VH2 made an illegal U-turn and attempted to exit Lexington Ave. VH2 eventually pulled over, yielding to the emergency lights. VH1 had also turned around and parked near VH2.

28.  Immediately the BPA exited his vehicle and again, identified himself as a U.S. Border Patrol Agent while wearing official Border Patrol Agent identifiers. The BPA gave commands to HERMOSILLO to exit the vehicle. HERMOSILLO was non-compliant, and the BPA reached inside the open window to unlock the door. HERMOSILLO was subsequently taken into custody.

29.  VH1 was then approached by BPAs and PECORA CARDENAS was instructed multiple times to get out of VH1. PECORA CARDENAS refused, and BPAs had to utilize a glass breaking tool to access the door lock and subsequently remove PECORA CARDENAS from VH1. PECORA CAREDNAS was pulled his arm away from BPAs and refused to

exit his vehicle. BPAs leveraged trained techniques to restrain PECORA CARDENAS and take him into custody.

**C.    Subsequent Information**

30.    Law enforcement searched HERMASILLO's person pursuant to his arrest and recovered his phone.  While handling HERMOSILLO's phone, I observed numerous notifications on the lock screen, which was publicly accessible without having to unlock the phone.

31.    HERMASILLO's lock screen showed a missed call from "Julian Protester" that occurred approximately 3-4 hours prior to 11:36 a.m. This time corresponds to the aforementioned incident involving both HERMOSILLO and Julian PECORA CAREDNAS driving in tandem around the BPA convoy.

32.    HERMASILLO's lock screen also showed the following:

a.    A text sent to HERMOSILLO from an individual saved in his phone as "bag lady" from approximately 3-4 hours prior to 11:36 a.m. stated "Forgot to reply but I alerted everyone immediately."

b.    An Instagram message sent approximately 3-4 hours prior to 11:36 a.m. stated "Patrolling DTLA for the next two hours if anybody hears anything. HMU!"

c.    Another Instagram message sent approximately 3-4 hours prior to 11:36 a.m. stated "Right now they're at Willow and Temple driving toward Cherry."

33.    I know based on training and experience it is integral for groups to utilize communication devices such as phones to communicate with other members of their group. I further know

that many times suspects attempt to utilize multiple different message applications to attempt to break the chain of messages and obfuscate some or all of their communications.

## V.  CONCLUSION

34.  For all the reasons described above, there is probable cause to believe that Arturo HERMOSILLO and Julian PECORA CAREDNAS violated 18 U.S.C. § 372 (Conspiracy to Impede an Officer).


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this  7  day of July, 2025 at  4:11pm .


      /s/ Autumn D. Spaeth
HONORABLE AUTUMN D. SPAETH
UNITED STATES MAGISTRATE JUDGE